**Allen E. FRYER, Appellant,**

v.

**STATE of Iowa, Appellee.**

**No. 66755.**

Supreme Court of Iowa.

Oct. 27, 1982.

Michael Green, Iowa City, Mary Schlicher, Waterloo, Kathryn Delafield and Helen Lucier, Student Legal Interns, Iowa City, for appellant.

Thomas J. Miller, Atty. Gen., Gary L. Hayward, Asst. Atty. Gen., and Randy L. Waagmeester, County Atty., for appellee.

Considered by REYNOLDSON, C.J., and HARRIS, McGIVERIN, LARSON and CARTER, JJ.

McGIVERIN, Justice.

Applicant Allen Fryer appeals the district court's denial of his application seeking postconviction relief from his 1974 conviction of first degree murder under Iowa Code sections 690.1 and .2 (1973). Fryer asserts the following issues on appeal:

1) the evidence was insufficient to convict him of first-degree murder;

2) the prosecution suppressed evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963);

3) admission of his November 30, 1973, statement to peace officers violated his constitutional rights;

4) the trial court erred in considering the admissibility of the November 30 statement in the presence of the jury;

5) his statements made on December 1, 1973, after arraignment and waiver of extradition, were inadmissible because there was no valid waiver of his right to counsel;

6) the trial court's failure to instruct the jury properly deprived him of a fair trial;

7) the prosecutor improperly drew attention to his failure to testify;

8) he received ineffective assistance of counsel; and

9) the postconviction court erred in taxing costs to him pursuant to Iowa Code section 625.1 (1981).

After review of the trial transcripts and accompanying exhibits, and the record in the postconviction court, our resolution of the issues requires affirmance of the post-conviction court's denial of Fryer's application seeking postconviction relief.

Applicant, Allen Fryer, and his brothers, James and David Fryer, were charged with the murders of four teenagers at Gitchie Manitou State Park in November, 1973. The victims of the shotgun slayings were Dana Baade, age 14, Stewart Baade, age 18, Michael Hadrath, age 15, and Roger Essem, age 17. A fifth teenager, Sandra Cheskey, age 13, was abducted from the scene, raped, and subsequently released in the driveway of her home. Applicant was tried and found guilty by a jury of four counts of first degree murder.[1] His subsequent court proceedings are discussed in *Fryer v. Hamilton,* 278 N.W.2d 5 (Iowa 1979).

I. *Iowa Code § 663A.8 (1981).* As a preliminary matter, we address the State's contention that section 663A.8 bars applicant from postconviction relief because he failed to raise the contested issues on direct appeal from his conviction. Fryer filed a timely direct appeal from his conviction and counsel was appointed. Counsel requested to withdraw under Supreme Court Rule 16 (now Iowa R.App.P. 104) because he con-

sidered the appeal frivolous; we dismissed the appeal as frivolous on March 19, 1975. *See Fryer,* 278 N.W.2d at 6.

A postconviction applicant must establish "sufficient reason" for failing to raise and cause adjudication of his claims on direct appeal. *Washington v. Scurr,* 304 N.W.2d 231, 235 (Iowa 1981); *Bledsoe v. State,* 257 N.W.2d 32, 33–34 (Iowa 1977); *State v. Boge,* 252 N.W.2d 411, 415 (Iowa 1977).

The postconviction court found that section 663A.8 did not bar the action in toto, and considered all grounds alleged in Fryer's amended application. We conclude that applicant did not deliberately bypass an opportunity to press his claim for relief. *See id.* at 414–15 (sufficient reasons for previous failure to assert grounds for relief apparent from record); *cf., Redding v. State,* 274 N.W.2d 315 (Iowa 1979) (deliberate and inexcusable failure to pursue claims for relief and appeal bars postconviction action). We have declined to construe section 663A.8 so as to erect a procedural obstacle to a meaningful hearing of applicant's claims for relief. *Boge,* 252 N.W.2d at 415. The State, in the present case, cannot argue that procedural obstacles bar Iowa's courts from hearing this applicant's claims for postconviction relief; it already has been found that the Iowa Postconviction Relief Statute was available to Fryer. *See Fryer,* 278 N.W.2d at 6. We, therefore, proceed to review applicant's claims for postconviction relief.

II. *Sufficiency of the evidence.* The State's theory at applicant's criminal trial was divided into three parts: (1) applicant shot and killed Roger Essem; (2) applicant aided and abetted the murders of Stewart and Dana Baade, and Michael Hadrath; and (3) applicant participated in, or aided and abetted a robbery or attempted robbery in the course of which the murders

---

1. David Fryer pleaded guilty to murder and we affirmed the trial court's determination that it was first degree murder. *State v. Fryer,* 226 N.W.2d 36 (Iowa 1975). James Fryer was found guilty by a jury of manslaughter of one

of the teenagers and of first degree murder of the other three. We affirmed these convictions. *State v. Fryer,* 243 N.W.2d 1 (Iowa 1976).

were committed. In determining whether applicant's conviction was supported by substantial evidence on these theories, we must "view the evidence in the light most favorable to the State, without regard to contradiction or inconsistencies and assisted by all reasonable inferences." *State v. Robinson,* 288 N.W.2d 337, 338 (Iowa 1980). "Substantial evidence means such evidence as could convince a rational trier of fact that the defendant is guilty of the crime charged beyond a reasonable doubt." *State v. Aldape,* 307 N.W.2d 32, 39 (Iowa 1981); *Robinson,* 288 N.W.2d at 339. We consider all of the evidence in determining evidential sufficiency.[2] *See State v. Schrier,* 300 N.W.2d 305, 306 n. 1 (Iowa 1980); *State v. York,* 293 N.W.2d 13, 15 (Iowa 1980).

■ A. Applicant's first contention is that there was insufficient evidence to support the giving of an instruction of premeditated murder of Michael Hadrath and Stewart and Dana Baade. No objection was made at trial to the jury instructions. Having failed to object at trial, Fryer cannot use postconviction relief as a substitute for such objection. *Horn v. Haugh,* 209 N.W.2d 119, 120–21 (Iowa 1973) (attempt to use postconviction relief as substitute for statutory remedy of lodging objections violates Iowa Code § 663A.2). Even issues of constitutional magnitude will not be addressed if not presented in the trial court.[3] *See State v. Williams,* 285 N.W.2d 248, 269 (Iowa 1979), *cert. den.,* 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980).

■ B. Ballistics evidence failed to link conclusively applicant's gun with the number-4 buck removed from Roger Essem's body.[4] Therefore, Fryer claims the State failed to prove part one of its theory—that applicant killed Roger Essem. Upon consideration of all the evidence, however, we find that a rational trier of fact could find beyond a reasonable doubt that applicant shot and killed Roger Essem. First, Fryer and his brothers spotted the youths around a campfire. After concluding that the teenagers had marijuana, the Fryer brothers retrieved shotguns from their vehicles in order to take the marijuana by force. The men then returned to the area of the campfire; Sandra testified that applicant's gun was raised to his shoulder at the time shots were fired and Roger Essem fell to the ground mortally wounded. Finally, Fryer does not deny that he was present before, during and after the shooting of Roger Essem.

■ C. Since the murders of Michael Hadrath and Dana and Stewart Baade took place after applicant left the park with Sandra, he argues that the facts are incon-

---

2. At the time of applicant's trial our standard of review was to consider only supporting evidence, whether contradicted or not. *See, e.g., State v. Tokatlian,* 203 N.W.2d 116, 119 (Iowa 1972). Subsequent to the trial we changed the rule in *Robinson,* 288 N.W.2d at 340, to comport with the language of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 *reh. den.* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence is to be considered* in the light most favorable to the prosecution.") In *Robinson* we held that the modification of the *Tokatlian* rule applied only to trials beginning on or after February 20, 1980, the date *Robinson* was filed. Robinson, 288 N.W.2d at 340. Since the outcome in this case is the same whether we apply the *Tokatlian* test or the *Robinson* test, we apply the latter.

3. We note, however, that these instructions were consistent with the State's theory of aiding and abetting which permitted the jury to find Fryer guilty as a principal under Iowa Code § 688.1 (1973) which provided:

> The distinction between an accessory before the fact and a principal is abrogated, and all persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense, or aid and abet its commission, though not present, must hereafter be indicted, tried, and punished as principals.

*See* subdivision II C.

4. There was some question as to whether all of the spent shells had been recovered from the scene (applicant's brothers removed some, which were recovered later). From the shells recovered, it was clear that applicant's gun had fired a shell containing number-4 shot—the type of shot removed from Michael Hadrath's arm.

sistent with the State's theory of aiding and abetting. While the mere presence of applicant at the scene of the crime does not prove that he aided and abetted its commission, *State v. Daves,* 259 Iowa 584, 586, 144 N.W.2d 879, 881 (1966), aiding and abetting need not be shown by direct proof. It may be inferred from circumstantial evidence including presence, companionship and conduct before and after the offense is committed. *State v. Myers,* 158 N.W.2d 717, 721 (Iowa 1968). A person found guilty as an aider and abettor is guilty as a principal. Iowa Code § 688.1 (1973).

■ There is sufficient evidence for the jury to have found that applicant either knowingly assented to the act or lent countenance or approval by active participation in it or by some manner encouraging it prior to its commission. *See State v. Barnes,* 204 N.W.2d 827, 828 (Iowa 1973). While retrieving their shotguns, the brothers discussed their plans to take the marijuana by force. Upon returning to the youths' campfire the brothers began shooting; applicant's shots hit two of the youths. The survivors were marched down the trail to the parking area. Twice Fryer stopped the procession to confer with his brother, David Fryer. Applicant put Sandra in his pickup and returned to where his brothers were waiting with the other teenagers. While driving Sandra around the countryside, he referred to himself as the "boss" and claimed that his brothers did whatever he told them to do.

■ D. As to the State's theory of felony-murder,[5] applicant contends that proof of a felony, robbery or attempted robbery, does not exist. A taking is necessary for the commission of a robbery. Iowa Code § 711.1 (1973);[6] *State v. Fonza,* 254 Iowa 630, 634, 118 N.W.2d 548, 551 (1962). The postconviction court found that "[n]othing was taken from the possession of the victims . . . no robbery was committed

. . . . But the record is replete with evidence of an attempt to perpetrate a robbery." Findings of the postconviction court which are supported by substantial evidence are binding upon appeal. Iowa R.App.P. 14(f)(1).

■ The common law principles of attempt require the State to prove (1) intent to commit the crime and (2) slight acts in furtherance of the crime that render voluntary termination improbable. *See State v. Roby,* 194 Iowa 1032, 1042–43, 188 N.W. 709, 714 (1922) (attempted rape); *State v. Cook,* 188 Iowa 655, 176 N.W. 674 (1920) (attempted larceny); *see also, Hamiel v. State,* 92 Wis.2d 656, 666, 285 N.W.2d 639, 646 (1979). We agree with the postconviction court's findings of the necessary elements of attempted robbery:

It is clear from Fryer's statement that he was possessed of the requisite intent. The brothers planned to take the marijuana. Confrontation with shotguns and shouts to come out with your hands raised are certainly steps sufficient to consummate the robbery and render voluntary termination thereof improbable.

There was sufficient evidence of record to support each part of the State's first degree murder theory. There exists no possibility that in convicting applicant the jury relied on a theory for which there was insufficient evidence. *See Sandstrom v. Montana,* 442 U.S. 510, 524–27, 99 S.Ct. 2450, 2459–61, 61 L.Ed.2d 39, 51–53 (1979) (conviction must be set aside if, in retrospect, impossible to say jury did not rely on theory for which there was insufficient evidence).

■ III. *Suppression of evidence.* Fryer attempts to bring his case within the second of three situations discussed in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct.

---

5. "All murder which is . . . committed in the perpetration or attempt to perpetrate any . . . robbery . . . is murder in the first degree . . . ." Iowa Code § 690.2 (1973).

6. "If any person, with force or violence, or by putting in fear, steal and take from the possession of another any property that is the subject of larceny, he is guilty of robbery . . . ." Iowa Code § 711.1 (1973).

2392, 49 L.Ed.2d 342 (1976),[7] in which evidence not disclosed to the defendant until after the trial may mandate a new trial. In the second situation, prosecutorial suppression of material evidence for which a specific pre-trial request was made, violates due process. *Id.* at 104, 96 S.Ct. at 2398, 49 L.Ed.2d at 350; *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1968); *see State v. Hall,* 249 N.W.2d 843 (Iowa 1977). Because Fryer is alleging constitutional fair-trial violations, we review under the de novo or totality of circumstances standard enunciated in *Kellogg v. State,* 288 N.W.2d 561, 563 (Iowa 1980). See *Hamann v. State,* 324 N.W.2d 906, 909 (Iowa 1982); *Sims v. State,* 295 N.W.2d 420, 422 (Iowa 1980).

■ The evidence that applicant claims the State suppressed consists of two investigative reports of alleged exculpatory statements made by Sandra.[8] These statements were not signed or verified by Sandra; there is no evidence that she ever saw them. *See State v. Horn,* 282 N.W.2d 717, 720–23 (Iowa 1979). We find that defense counsel made a specific request which included these reported statements.[9] The postconviction court correctly found that although Fryer's counsel was allowed to view the prosecution's file prior to trial, the two reported statements were not in that file. The evidence shows that at the time of the pretrial discovery, they were in the central BCI file in Des Moines. Although the prosecuting attorney did not recall having seen the investigative reports of Sandra's statements prior to the postconviction hearing, the State nonetheless had a duty to make those statements available to defense counsel if they were subject to discovery. Attribution occurs whenever the allegedly suppressed information is known by the "prosecution team"—investigative units under the prosecutor's control, or agencies allied with the prosecutor in connection with the subject case. See *Hamann,* 324 N.W.2d at 909–910, and cases cited therein. "The critical factor is superior access on the part of the prosecution, and the need to equalize access for both parties." *Id.* at 914.

■ A new trial is warranted if the evidence was wrongfully suppressed and is material. "In order for materiality to exist it must appear that the suppressed evidence affected the outcome of the trial." *State v. Love,* 302 N.W.2d 115, 123 (Iowa 1981). But "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense. * * * If the suppression of evidence results in constitutional error, it is because of the character of the evidence . . ." *Agurs,* 427 U.S. at 109–110, 96 S.Ct. at 2400–401, 49 L.Ed.2d at 353. For example, in *Hall,* we held that non-disclosure of some grand jury testimony, most of which was already available to defendant, was not " 'material' in the sense its nondisclosure deprived defendant of a fair trial." *Hall,* 249 N.W.2d at 848. On the other hand, the suppressed evidence in *State v. Peterson,* 219 N.W.2d 665, 674 (Iowa 1974) was information given to police officers which indicated that a man other than the defendant may have killed the victim. This we found to be

---

7. For our most recent and thorough discussion of *Agurs,* see *Hamann v. State,* 324 N.W.2d 906 (Iowa 1982).

8. At trial Sandra testified that Allen Fryer shot Roger Essem and Michael Hadrath. The investigative reports indicate that on the night of the arrest she stated, "He [Allen Fryer] is the one that shot Mike [Hadrath] and Stu [Baade] that night."

9. Applicant's pretrial motion requested the following:

VI.

Any statement signed, prepared or adopted by prosecution witness, Sandra K. Cheskey.

VII.

Any hand written notes, stenographic notes, recordings, drafts or other written record of interviews from which the statement referred to in paragraph VI above was prepared.

VIII.

Any hand written notes, stenographic notes, recordings, drafts or other written record of interviews or oral statements of Sandra K. Cheskey which are a continuous narrative statement and are recorded verbatim or nearly so.

material—it deprived the defendant of a fair trial.

■ Assuming, without deciding, that the investigative reports of Sandra's statements should have been produced, they were not material. In both the suppressed report and the disclosed statements, Sandra identified applicant as "the Boss" who had shot two of her companions at Gitchie Manitou State Park. While it is true that the State's theory of first degree premeditated murder of Roger Essem was strongly buttressed by the use of the later, disclosed statements, defense counsel was able to damage seriously Sandra's credibility as to who shot which victim during cross-examination:

MR. DEWAAY (DEFENSE COUNSEL): Q. All right. Now did you—You said then there was a second shot fired?

THE WITNESS: A. Yes.

Q. And could you tell who fired the second shot?

A. Allen.

THE DEFENDANT: (Shaking head in negative manner at counsel table.)

MR. DEWAAY: Q. And do you know for sure that it could not have been James Fryer that fired the second shot?

THE WITNESS: A. Well, Allen's gun was in the air pointing at him.

Q. That may be, but we are talking about firing a shot, you see. Didn't you tell Mr. Ladegaard at the first hearing that you didn't know for sure whether James Fryer had not fired the shot?

A. (Pause) I suppose anyone could have shot it.

Q. Anyone could have?

A. (no response.)

Q. This is your testimony, really, and things were happening fast at that time; is that true?

A. Yes

Q. So it was very difficult for anyone to know exactly what was happening, right?

A. Yes.

Q. All right. But you know that David Fryer did fire the first shot? That part you do know, or are you even sure about this?

A. Well, if you're saying that, somebody back in the trees could have fired that one, too, just as well, too, then.

Q. So you are not even sure who fired the first shot?

A. I didn't see smoke come out of the air, but the gun was pointing at them. I didn't see their finger pull the trigger.

Q. And you saw David fire the first shot?

A. (No response.)

Q. Sandra, I don't want to argue with you about it, but I want to be fair. I want to be sure that you know exactly what we are talking about. It could have been possible, could it not, for any one of the three to have fired the first shot?

A. I suppose.

Q. Or for any one of the three to have fired the second shot?

A. I suppose.

Q. Or that the same fellow fired the first shot and the second shot?

A. If he wasn't on the ledge, yes.

Q. It would have been possible that one of the three could have fired both of the shots? Is that not possible?

A. I—Yeah.

Sandra's testimony on cross-examination shows that she was very confused about the events surrounding the shootings she witnessed. The reports of her alleged statements would have done no more than demonstrate her uncertainties of which the jury was well apprised. They would not, however, have absolved Fryer of the allegation that he shot two of the defenseless youths; failure to obtain the reports did not deprive him of a fair trial.

■ IV. *Admissibility of the November 30, 1973, statement.* The voluntariness of a confession depends upon the totality of the circumstances encompassing the characteristics of the accused and the details of the interrogation process. *State v. Holderness,* 301 N.W.2d 733, 739 (Iowa

1981). The burden is on the State to prove that the confession was made voluntarily, knowingly and intelligently. *Id.* Fryer claims that the circumstances surrounding his November 30 confession demonstrate that it was not voluntary: (1) he was not sufficiently apprised of his rights to knowingly and voluntarily waive them; (2) he was not taken before a magistrate for nineteen hours; (3) the purpose of the interrogation was to obtain a confession and his will was overborne by lack of food and sleep; and (4) the interrogation continued after he had requested an attorney. The postconviction court found no merit in these contentions.

█ A. Applicant was given his *Miranda* rights many times and in many ways [10] between the time of his arrest and the signing of the confession. He acknowledged that he understood his rights many times and signed a waiver of them. An express written waiver "is usually strong proof of the validity of that waiver." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979). It is not sufficient alone, however, to establish waiver; we must find from the facts and circumstances that the waiver was voluntarily, knowingly and intelligently made. *Id.,* 99 S.Ct. at 1757, 60 L.Ed.2d at 292; *State v. Hartman,* 281 N.W.2d 639, 643 (Iowa Ct.App.1979).

█ Fryer claims, however, that he did not have the requisite mental capacity to understand his rights, and then to knowingly and voluntarily waive them. Tests given to Fryer indicate that he functions at the "dull-normal range." [11] Reading problems and subnormal intelligence do not automatically preclude a confession from being voluntary. *Holderness,* 301 N.W.2d at 739; *State v. Gilmore,* 259 N.W.2d 846, 859 (Iowa 1977); [12] *State v. Fetters,* 202 N.W.2d 84, 89 (Iowa 1972). As found by the postconviction court, the facts and circumstances indicate that Fryer was capable of understanding and knowingly waiving his rights. His rights were given to him in every manner conceivable. He was not illiterate; he told the interrogators so himself. He had a driver's license and not only could operate a motor vehicle, but could perform such complicated mechanical tasks as removing the head of a combine. *See Holderness,* 301 N.W.2d at 739 (defendant's ownership of and ability to operate an automobile indicative of sufficient understanding).

█ B. Although a magistrate was available, applicant was not taken before a magistrate until nineteen hours after his arrest. Such a delay in presentment is further evidence to consider in review of the voluntariness of his confession. *Stein v. New York,* 346 U.S. 156, 187–88, 73 S.Ct. 1077, 1094, 97 L.Ed. 1522, 1544 (1953). In this case, however, the delay was not unreasonable. First, a large part of the delay can be attributed to Fryer having been given an opportunity to sleep. [13] Second, at the time of the interrogation applicant had not been indicted, and although the State may have had sufficient evidence for an open charge of murder, we have held, under similar circumstances, that continued interrogation for the purpose of determining the proper charge is not improper if circumstances indicate that defendant was not being held for the sole purpose of obtaining a confession. *State v. Milford,* 186 N.W.2d 590, 592 (Iowa 1971); *State v. Tharp,* 258 Iowa 224, 230, 138 N.W.2d 78, 82 (1965);

---

10. Police officers read Fryer his rights; they gave him a copy to follow while his rights were read to him; he was given waiver forms to read and sign; and the interrogators also paraphrased his rights and explained them in the form of direct questioning.

11. Fryer's full scale IQ was measured at 87. A break down of his scores shows a 77 on the verbal section and a 101 on the performance section of the test.

12. Gilmore's reading level was tested at the third-grade level, 259 N.W.2d at 859, while Fryer's was determined to be at a grade level of 5.4.

13. The actual interrogation of Fryer lasted about twelve hours. He was allowed to sleep while his statement was transcribed; thus, he read and signed it after approximately six to seven hours of sleep.

*State v. Hodge,* 252 Iowa 449, 458, 105 N.W.2d 613, 618 (1961).

We find that much of the delay in presentment can be attributed to allowing Fryer to sleep. Such a delay in presentment does not render his statement involuntary.

■ C. When it is shown that the intent of interrogation was to obtain a confession, "the confession obtained must be examined with the most careful scrutiny." *Spano v. New York,* 360 U.S. 315, 324, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265, 1272 (1958) (interrogation conducted after a grand jury had found sufficient cause for defendant to stand trial on first-degree murder, and the police had an eyewitness to the shooting).

The purpose of the interrogation was not to obtain a confession. See subdivision B above. Nor is there evidence that the interrogators attempted to deceive Fryer or trick him into confessing. *Cf., Id.* at 323, 79 S.Ct. at 1207, 3 L.Ed.2d at 1272 (childhood friend, a fledgling police officer, evoked false sympathy by feigning that defendant's refusal to talk would cost him his job as a policeman). They merely confronted him with the inconsistencies of his own statement and that of his brother, David Fryer. In response to this Fryer stated, "You're right, you hit the nail right on the head, get those people back here, I want to tell them." He then proceeded to give the statement in question. Although approximately twelve hours elapsed between the start of interrogation and the completion of recording his confession, frequent breaks were taken and applicant was allowed to use the restroom and telephone at any time upon request. The officers and Fryer, also, drove to various places associated with the crimes. Coffee and donuts were available; an unsuccessful attempt had been made to find an open restaurant during a ride back to the scene of the crime. Lack of sleep and food may indicate that the will has been overborne, *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), but there is no indication that Fryer ever com-

plained or that he was pushed beyond his limits. *Cf., State v. Cullison,* 227 N.W.2d 121 (Iowa 1975) (defendant flown half-way across the country and interrogated continually for nine and one-half hours to point of collapse—statement involuntary).

■ The postconviction court found that Fryer's "will was not overborne at the time he made the statement, at any time prior thereto, or at any time thereafter, material to this cause." We agree.

D. Not until his postconviction relief hearing did applicant claim that as he was led into the interrogation room, he asked Sheriff Gaulke to contact an attorney.[14] Detective Flowers, who accompanied Fryer to the interrogation room, testified, however, that no request for an attorney was made, nor did Fryer request to use the phone; the postconviction court found that no request had been made. There are no facts which indicate that the postconviction court erred.

■ Affirmative conduct indicative of voluntary, intentional and knowing relinquishment of the right to counsel may constitute a waiver. *State v. Lamp,* 322 N.W.2d 48, 55 (Iowa 1982). Fryer understood his rights but did not request to remain silent or to use the phone. He answered questions cooperatively and agreed to go for a ride in order to show the sheriff where he had thrown his gun, the park, and where he had stopped with Sandra to get some pop. Fryer's actions and words clearly constituted a waiver of his right to counsel. *Cf., Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (response to police questions not a waiver when desire expressed to deal with police only through counsel).

The interrogation which culminated in applicant's confession, may not have been a pleasant experience for him, but the surrounding circumstances do not indicate that Fryer's confession was not voluntary. The postconviction court was correct in its finding.

**14.** Former Sheriff Gaulke of Minnehaha County, South Dakota, has moved to Arizona and was not available to testify at the postconviction hearing.

V. *Consideration of confession's admissibility in presence of jury.* Fryer contends that the trial court erred in determining the admissibility of his confession in the presence of the jury. He relies on *State v. Walton,* 247 N.W.2d 736, 740 (Iowa 1976) ("When a defendant makes an appropriate objection to the admissability of an alleged confession, the trial court even though not requested to do so must conduct an evidentiary hearing outside the presence of the jury . . ."). This right stems from the decision in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (voluntariness of inculpatory statements must be determined by trial court before submission to jury). *Walton,* however, was decided subsequent to Fryer's trial, and it exceeds the mandate of *Jackson. See Pinto v. Pierce,* 389 U.S. 31, 32, 88 S.Ct. 192, 193, 19 L.Ed.2d 31, 32, *reh. den.* 389 U.S. 997, 88 S.Ct. 462, 19 L.Ed.2d 499 (1967) (question of voluntariness determined in presence of jury; no constitutional denial of rights if defendant does not object to hearing in presence of jury).

█ The trial court made an implicit determination of voluntariness, albeit in the presence of the jury, before allowing the jury to hear the confession. No objection was made to the hearing in the jury's presence; in fact, Fryer's trial counsel initiated it. The statement was voluntary, and there is no indication in the record that Fryer was prejudiced by this hearing. We hold that this voluntariness hearing complied with the requirements of *Jackson. Walton* does not apply retroactively.

VI. *Admissibility of December 1, 1973, statement.* Fryer was arraigned, along with his brothers, between 12:30 and 1:00 p.m. on November 30, 1973, in Municipal Court in Sioux Falls, South Dakota, on a fugitive warrant charging him with the shootings in Gitchie Manitou State Park in Iowa. Later that day he appeared in court for an extradition hearing, and about 4:00 p.m. a South Dakota attorney was appointed for the purpose of representing him at the extradition hearing. At approximately 4:30 p.m. Fryer waived extradition. On December 1, 1973, at about 10:30 a.m., Iowa BCI Agent Allen Steinbeck questioned Fryer and obtained information for two diagrams of the park area. Prior to the questioning, applicant was read his rights, he acknowledged that he wished to talk and signed a waiver of rights form.

█ The interrogation (after arraignment) was conducted after applicant's sixth amendment rights to counsel attached. *See Brewer v. Williams,* 430 U.S. 387, 399, 97 S.Ct. 1232, 1239–40, 51 L.Ed.2d 424, 436 (1977). Thus the question before us is whether Fryer effectively waived his rights.[15] *See State v. Johnson,* 318 N.W.2d 417, 432 (Iowa 1982). The State bears a heavy burden in proving " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Brewer,* 430 U.S. at 404, 97 S.Ct. at 1242, 51 L.Ed.2d at 439 (quoting from *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938) ). *Brewer* requires a two-part analysis: proof that the suspect (1) understood his right to counsel and (2) affirmatively relinquished that right.

In *Johnson* we declined to set the threshold for finding a waiver of a suspect's sixth amendment right to counsel in pretrial interrogation substantially higher than that for waiver of the corresponding right under the fifth amendment. *Johnson,* 318 N.W.2d at 435. Even so, great care must be taken in analyzing the State's claim of waiver.

Fryer understood he had a right to counsel. His rights had been read to him and he signed a waiver form. He was not a stranger to the criminal process: the gravity of the situation would have been apparent to him from the arraignment and extradition proceedings.[16]

---

15. We agree with the postconviction court's finding that Fryer was not represented by counsel on December 1, 1973. His South Dakota attorney's representation ceased when he waived extradition. There was no attorney to notify concerning the December 1 questioning.

16. *Cf., United States v. Mohabir,* 624 F.2d 1140 (2d Cir. 1980). Effective waiver of the sus-

This was not a case like *Brewer* in which the authorities had promised the suspect's attorney that he would not be questioned further, and then emotionally coerced him into talking. Fryer consented to the further interrogation. He intentionally used this interrogation session to mislead the investigators, telling them he had thrown the gun into a pond when in fact, he had hidden it in his home. No new or useful information was obtained from the questioning on December 1.

We find that applicant understood his rights and affirmatively relinquished them; there was no prejudice in the admission of the December 1 statements.

VII. *The jury instructions.* Fryer now objects to the jury instructions because they did not properly inform the jury of the elements of the crimes charged. Defense counsel did not object to the trial court's instructions because he felt they were consistent with his theory of defense which was that Fryer did not kill anyone. He wanted included offenses submitted to the jury and hoped, at most, for a conviction on a lesser charge. Applicant cannot use postconviction relief as a substitute for such objection. *Horn,* 209 N.W.2d at 120–21. We note, also, that the test for relief from a jury instruction in a federal postconviction hearing is " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " *United States v. Frady,* ——

U.S. ——, ——, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816, 831, *reh. den.* —— U.S. ——, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982) (quoting from *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203, 212 (1977) ).

VIII. *Prosecutorial misconduct.* Fryer claims that the prosecutor's questioning of the State's ballistics expert improperly drew attention to his failure to testify.[17] The reference to Fryer's failure to testify was an indirect reference about which his trial counsel made a tactical decision not to object. Any objections as to improperties in the testimony have been waived. *See State v. Johnson,* 272 N.W.2d 480, 483 (Iowa 1978), *after remand,* 298 N.W.2d 293, 295 (Iowa 1980).

IX. *Ineffective assistance of counsel.* Fryer contends that counsel's failure to object to numerous alleged errors, including instructions, improper questions, admission of applicant's confession and his failure to seek a change of venue resulted in ineffective assistance of counsel.

In a postconviction proceeding the petitioner has the burden of proof to establish by a preponderance of the evidence a claim of ineffective assistance of counsel. The petitioner must overcome a presumption that counsel is competent. The ultimate test is whether under the entire record and totality of the circumstances counsel's performance was within the range of normal competency. When the claim of ineffective assistance of counsel is premised on the failure of counsel to

---

pect's *Miranda* rights was insufficient in itself because unlike Fryer who had been through the court system before, Mohabir was a native of Guyana who was involved in a conspiracy to permit citizens of the Commonwealth to enter the United States through Canada without obtaining a visa. Past experience, the proceedings, he had just been through, and a *Miranda* warning should have been sufficient to inform Fryer of his rights and the seriousness of waiving them.

**17.** The questioning to which Fryer now objects was as follows:

*Duane L. Barton (Redirect Examination)*
Q. Mr. Barton, just one thing. Would you tell us whether or not you could tell whether there had been shells picked up and removed from this area?
A. I would have no way of knowing that.
Q. And could you state whether or not you would know whether the defendant picked up and removed any shells from this area?
A. I would have again no way of knowing this.
Q. Who would know?
A. The defendant, I would assume.

take some action, the petitioner must demonstrate that (1) counsel failed to perform an essential duty, and (2) prejudice resulted.

*Henderson v. Scurr,* 313 N.W.2d 522, 524 (Iowa 1981) (citations omitted).

 A. Fryer alleges that his trial counsel, Donald DeWaay, failed to investigate and, where appropriate, contest the admissibility of his statements to peace officers. Contrary to the implications of this allegation, counsel did review the entire prosecutorial file, which was made available. The postconviction court found that DeWaay was unaware of any circumstances suggesting Fryer's statements were not voluntary and in fact, "none existed." *Cf., Rinehart v. Brewer,* 561 F.2d 126 (8th Cir. 1977) (defense counsel who failed to seek suppression when he knew of circumstances which called into question voluntariness of defendant's confession provided ineffective assistance). Furthermore, as noted by the postconviction court, "as a matter of trial tactics or strategy, by allowing Fryer's statement . . . to be admitted in evidence, defense counsel had Fryer's largely exculpatory version of the affair before the jury without Fryer being required to take the stand and [be] subjected to cross-examination." When counsel makes a reasonable tactical decision, this court will not engage in second-guessing. *Sims,* 295 N.W.2d at 423–24.

 B. The slayings at Gitchie Manitou State Park received extensive pretrial publicity in Lyon County, where the trial was held. In many cases, defense counsel would have sought a change in venue so that his client could be tried "in an atmosphere undisturbed by so huge a wave of public passion." *Irvin v. Dowd,* 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751, 759 (1961) (prisoner denied due process under fourteenth amendment because jury in state trial not impartial due to widespread and inflammatory publicity). The question of when to seek a change of venue is, however, a matter of professional judgment about which experienced trial lawyers frequently disagree. *Karasek v. State,* 310 N.W.2d 190, 191 (Iowa 1981). Here, counsel made a tactical decision, based on his knowledge of the prospective jurors and counsel's standing in the Lyon County community, not to seek a change of venue. Fryer, his brothers, and the victims were residents of South Dakota and not Lyon County, Iowa. "Improvident trial strategy, miscalculated tactics, or mistakes in judgment do not necessarily amount to ineffective assistance." *Sims,* 295 N.W.2d at 423. Moreover, we have held that defense counsel's failure to seek a change of venue does not reflect on competency, nor is it indicative of ineffectiveness. *Karasek,* 310 N.W.2d at 191.

 C. Counsel's failure to have closing arguments recorded, Fryer asserts, was a breach of his duty to preserve the record, *State v. McFarland,* 287 N.W.2d 162 (Iowa), *cert. den.,* 449 U.S. 853, 101 S.Ct. 147, 66 L.Ed.2d 66 (1980), and this prevents him from substantiating his claim of prosecutor misconduct.[18] If counsel's inaction results in an insufficient record for appellate review, counsel has provided ineffective assistance of counsel. *Entsminger v. Iowa,* 386 U.S. 748, 87 S.Ct. 1402, 18 L.Ed.2d 501 (1967). However, defense counsel is not required to have closing arguments recorded. If they are not recorded, a proper objection at trial will preserve the error. *See State v. Phillips,* 226 N.W.2d 16, 18 (Iowa 1975). We agree with the finding of the postconviction court that "DeWaay was an experienced trial attorney, and as such was aware that had any improper argument been made, the way was open for him to object and make a record and obtain a ruling from the court." The record made by counsel was sufficient for appellate review purposes.

---

18. Fryer now claims that in closing arguments the prosecutor told the jury that if they didn't convict Fryer, he wanted "two days to get out of town."

D. Counsel's objection to a diagram made with applicant's assistance on December 1 was sustained, but because no motion was made to strike the foundation testimony it cannot be attacked now. *State v. Washington,* 257 N.W.2d 890 (Iowa 1977), *cert. den.,* 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1978). Fryer claims this is analogous to failure to object to the admission of damaging evidence. *See United States v. Easter,* 539 F.2d 663 (8th Cir. 1976), *cert. den.,* 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977). Although the testimony could have been stricken, the evidence was already before the jury in the form of Fryer's admitted statement of November 30, and subsequently the witness was allowed to testify as to all of the statements made on December 1, 1973, and to use another exhibit to demonstrate how that statement correlated with the layout of the park. When there is no reasonable possibility that the error complained of might have contributed to the conviction, error is harmless. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709, *reh. den.,* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967). We so find here.

E. Fryer contends that he was deprived of his fifth amendment rights because counsel did not object to the line of questioning of the state's witness, Duane Barton, which allegedly drew attention to Fryer's failure to testify. Counsel chose not to object for two specific, tactical reasons: (1) in view of the ballistics report, he did not believe the testimony hurt Fryer and (2) he felt, as a matter of strategy, that any objection would bring the matter to the further attention of the jury. When such testimony is allowed to proceed for strategic reasons there is no ineffective representation. *See United States v. Bad Cob,* 560 F.2d 877, 882–83 (8th Cir. 1977); *cf., Boyer v. Patton,* 579 F.2d 284 (3d Cir. 1978) (failure to object to question alluding to defendant's silence sole basis for finding counsel

ineffective: (1) question directly referred to defendant's silence at time of arrest and implied tacit admission; (2) trial court reiterated and supported implication in charging jury). Although Fryer may feel that his counsel's tactics were miscalculated, no prejudice resulted from them.

F. Fryer also contends that his counsel was ineffective because he failed to object to jury instructions, which did not properly inform the jury of the elements of the crimes charged.[19] Fryer has failed to demonstrate that he was prejudiced by counsel's failure to object to the jury instructions. *See* division VII above. We agree with the postconviction court that "DeWaay's approach to instructing the jury indicates that his efforts were well within 'the range of normal competency.'"

As we have stated previously, when reviewing counsel's effectiveness, we do not, in the light of 20–20 hindsight, assume the role of Monday morning quarterback. *Hinkle v. State,* 290 N.W.2d 28, 30 (Iowa 1980). This, however, is what applicant has attempted to do with postconviction relief. During the trial and immediately afterwards, Fryer stated to the trial judge that he was satisfied with the services of his attorney, Mr. DeWaay. Fryer also told DeWaay personally that he was satisfied with DeWaay's services and that he had been more helpful than any of Fryer's past attorneys. Apparently, Fryer's dissatisfaction with counsel's services did not arise until he sought postconviction relief.

We have examined the entire record and find that based on the totality of the circumstances, counsel's performance was within the range of normal competency.

[E]ffective assistance of counsel does not mean successful. Rather, it denotes conscientious, meaningful legal representation wherein the accused is advised of his rights and honest, learned and able counsel is accorded reasonable opportuni-

---

19. In his claim of ineffective assistance of counsel, Fryer does not raise the giving of an

instruction of direct murder of Michael Hadrath and Stewart and Dana Baade.

ty to perform his assigned task. Improvident trial strategy, miscalculated tactics, mistake, carelessness or inexperience do not necessarily amount to ineffective counsel.

*Id.* at 30–31 (citation omitted).

 X. *Taxation of costs to applicant.* Pursuant to Iowa Code section 625.1 (1981) the postconviction court ordered that costs in the amount of $1,228.75 be taxed against applicant. Applicant does not challenge the amount or assert that such assessment would deny him or like persons access to the courts; he merely asserts that he had been granted permission to proceed at state expense under section 663A.5.

A postconviction proceeding is a civil suit; thus section 625.1 ("Costs shall be recovered by the successful party against the losing party") is applicable. Applicant, however, argues that Code section 663A.5 (1981) supercedes section 625.1 because section 663A.5 makes postconviction proceedings available to an indigent applicant at state expense—regardless of which party prevails.

Applicant has misconstrued the purpose of section 663A.5. It merely advances the costs of a postconviction proceeding to the indigent so that he or she will not be prevented from seeking redress of alleged defects in the conviction.[20] We assume that all applicants will not be destitute forever. Some will return to society, and others may obtain funds from other sources, e.g., civil judgments or inheritances. It is not unreasonable for the State to recover, whenever possible, the costs it has advanced. We note, however, that the practical effect of taxing court costs in postconviction proceedings will be the same as that provided for statutorily in habeas corpus proceedings: if the losing party is confined to a state institution and is indigent, the State will have to absorb the costs. *See* Iowa Code § 663.44 (1981).

In summary, we have reviewed all of the record and find no merit in Fryer's contentions and no prejudice to his right to a fair trial. We affirm the postconviction court's denial of postconviction relief.

AFFIRMED.

---

**20.** This is consistent with procedures in habeas corpus proceedings which also allow costs to be taxed to a losing plaintiff. Iowa Code § 663.44 (1981).