# IN THE COURT OF APPEALS OF IOWA

No. 23-1411
Filed July 2, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DONTAYE JERMAINE BURTON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan,

Judge.


        A defendant challenges the sufficiency of the evidence supporting his

convictions for first-degree murder and first-degree robbery.  **AFFIRMED.**


        John C. Heinicke of Kragnes & Associates, P.C., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Adam Kenworthy, Assistant Attorney

General, for appellee.


        Considered without oral argument by Ahlers, P.J., Sandy, J., and

Mullins, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2025).

**MULLINS, Senior Judge.**

Dontaye Burton appeals his convictions for first-degree murder and first-degree robbery. He challenges the sufficiency of the evidence. Reviewing for legal error, we find substantial evidence supports the jury's verdict and therefore affirm Burton's convictions.

## I. Background Facts and Proceedings

On the morning of July 17, 2022, police received a report of a death at a Des Moines apartment building. When they arrived, they found Sean Chapman on his kitchen floor, surrounded by a pool of blood. The apartment was ransacked. A .40-caliber casing lay near Chapman's body, and a bullet was lodged in the wall. Chapman had been shot in the head.

Outside the building, a police officer noticed Dontaye Burton walking away from the scene. The officer asked Burton to stop, but Burton got into a car and drove off. When police stopped the vehicle, they saw blood on Burton's jeans. Two cell phones, cash, and a set of car keys were seized from inside his pockets. In an audio-recorded interview, Burton told detectives that both phones were his. He denied being inside Chapman's apartment.

Investigation would reveal that one of phones in Burton's pocket belonged to Chapman. So did the blood on Burton's clothing. The keys went to a white Chevy Tahoe parked outside the apartment building. Inside, Police found Burton's

wallet, marijuana, a black duffel bag, and a .40-caliber handgun, which would later be matched to the bullet in Chapman's apartment.[1]

The State charged Burton with first-degree murder and first-degree robbery. During the course of a seven-day trial, it called more than two dozen witnesses and introduced roughly 270 exhibits. Key to the State's case was the testimony of Auda'Cee Lamay, a friend of Chapman's who was present at the time of his death. Lamay testified that she arrived at Chapman's apartment around 2:00 a.m. to find two men in the living room. One was Antonio Ross, who Lamay knew as "T-folks." The other was Burton. They were talking with Chapman about a drug transaction. According to Lamay, Chapman was a dealer of marijuana and cocaine. Burton claimed Chapman owed him money.

Lamay testified that she sat on the couch as the men's conversation turned heated. Eventually, Burton and Chapman started "tussling." Chapman "picked [Burton] up and slammed him" on the ground. The fight then moved into the hallway. Lamay recalled hearing Burton say he and Ross would "come and blow this bitch up." Eventually, Burton and Ross left. Chapman came back inside the apartment, where he and Lamay smoked marijuana, had sex, and fell asleep in Chapman's bedroom.

Lamay awoke to the sound of someone knocking on the apartment door. Chapman got up. Lamay listened from bed as Chapman cocked a gun, answered

---

[1] The black duffel bag also contained two additional guns—a nine-millimeter handgun and an AR-15 rifle—which a State witness would later testify belonged to Chapman.

the door, exchanged a few words, and laughed. Then, Lamay heard a gunshot. A voice she recognized as Burton stated, "That n---- is dead."

Scared, Lamay sat up and announced that she was in the bedroom. Burton stepped in and aimed a gun at her head. Burton threatened to "smoke" Lamay, then he walked her to the kitchen to see Chapman's body. After that, Burton told Lamay to help him search the apartment.[2] She noticed her purse and keys were no longer in the living room where she had left them. Lamay recalled Ross coming and going as Burton rifled through Chapman's things. Eventually, Lamay escaped and ran to her grandmother's house nearby.

In addition to Lamay's testimony, the State introduced surveillance footage from security cameras at the apartment complex. The video evidence shows Burton and Ross entering Chapman's building shortly before 2:00 a.m. Lamay arrives less than ten minutes later. At 2:16 a.m., another man—who investigators identified as Dustin Goben—enters the building. Not long after that, Burton, Ross, and Goben emerge together. The three men talk in the parking lot, where Burton makes several gestures toward the apartment building. Eventually, the men board a black Cadillac and drive away.

Around 4:30 a.m., the white Tahoe arrives in the lot. Burton, Ross, and Goben convene for a short conversation before entering the apartment building. Burton wears an Iowa Hawkeyes stocking cap, which police would later find in Chapman's apartment. None of the men carry bags. Fourteen minutes later, Goben exits the building with a gray backpack. Two minutes after that, Ross

---

[2] Lamay did not discuss at trial what Burton wanted her to find. However, she testified that Ross asked Burton to look for cocaine.

appears, carrying Lamay's purse. Over the course of the next hour, Goben, Ross, and other individuals enter and exit the building.

At approximately 6:08 a.m., Burton reappears for the first time, carrying a black duffel bag on his shoulder. A black object consistent in size and shape to the Smith & Wesson handgun is visible in Burton's back pocket. Subsequent footage depicts Burton entering and exiting the apartment building with additional items, including pairs of sneakers, a video game console, and a plastic sack later determined to contain marijuana. Investigators would find the shoes and drugs in the white Tahoe. The video game console—which matched the serial number on packaging left in Chapman's apartment—was recovered from Ross's vehicle.

The jury returned a verdict finding Burton guilty of first-degree murder in violation of Iowa Code sections 707.1 and 707.2 (2022) and first-degree robbery in violation of Iowa Code sections 711.1 and 711.2. Burton moved for a new trial, arguing the verdict was contrary to the weight of the evidence. The district court denied his motion. It sentenced Burton to life without parole for his first-degree murder conviction and a concurrent term of imprisonment for his robbery conviction. This appeal followed.

## II.     Standard of Review

We review challenges to the sufficiency of evidence for correction of errors at law. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). A jury's verdict must stand if it is supported by substantial evidence. *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted). We review the entire trial

record. *State v. LuCore*, 989 N.W.2d 209, 215 (Iowa Ct. App. 2023). But we do not reweigh the evidence or resolve questions of credibility—those decisions are for the factfinder. *See Cahill,* 972 N.W.2d at 34 (citing *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006)).

## III.     First-Degree Murder

Burton contends the State's evidence was insufficient to support his conviction for first-degree murder. The district court instructed the jury that the State needed to prove the following elements to convict Burton on that charge:

1. On or about July 17, 2022, Dontaye Burton, individually, through joint criminal conduct, or someone he aided and abetted, shot Sean Chapman.
2. Sean Chapman died as a result of being shot.
3. Dontaye Burton, individually, through joint criminal conduct, or someone he aided and abetted, acted with malice aforethought.
4. Donaye Burton, individually, through joint criminal conduct, or someone he aided and abetted,
   a. acted willfully, deliberately, premeditatedly and with a specific intent to kill Sean Chapman, or
   b. was committing the crime of Robbery in the First Degree when the killing occurred.[3]

Nobody disagrees that Chapman died from a gunshot. However, Burton challenges the sufficiency of the evidence on each of the other elements. He argues the State failed to offer "more than suspicion, speculation, or conjecture" to show that Burton was Chapman's shooter. *State v. Jones*, 967 N.W.2d 336, 343–44 (Iowa 2021). Alternatively, Burton argues the State's evidence fails to show he had the necessary mental state for first-degree murder. We address these arguments in turn.

---

[3] Burton raises no challenge to the district court's instructions, which are law of the case for purposes of our review. *See State v. Brimmer,* 983 N.W.2d 247, 256 (Iowa 2022).

**A. Identity**

Burton first contends the State "failed to provide substantial evidence that Burton or someone he aided and abetted shot Chapman." He emphasizes that police never found his fingerprints or DNA on the Smith & Wesson handgun and that his clothing was never tested for gunshot residue. Burton also notes that investigators never attempted to enhance the video footage of him exiting the building shortly after 6:00 a.m. to determine if the item in his back pocket was, in fact, the murder weapon. Despite these points, the question at hand is not what evidence the State might have obtained with further investigation. The question is whether the evidence admitted at trial is adequate to support Burton's conviction.

Lamay testified that, hours before the murder, Burton had visited the apartment and fought with Chapman over money Burton claimed to be owed. After Chapman slammed Burton to the ground, Burton threatened to return and "blow this bitch up." Outside the apartment, security cameras captured Burton talking with his companions and making gestures toward Chapman's building. The jury could reasonably infer from these facts that Burton was angered by his dispute with Chapman and that he was motivated to seek retribution.

Later, after a knock at the door and the sound of a gunshot, Lamay heard Burton declare Chapman deceased.[4] Almost immediately thereafter, Burton entered the bedroom and threatened Lamay. He then spent "forty-five minutes or

---

[4] Burton argues that Lamay gave conflicted testimony on this point, suggesting on cross-examination that it was Ross who announced, "That n---- is dead." Upon review of the trial transcript, we find Lamay's subsequent statement ambiguous. In any event, to the extent Lamay gave competing accounts, it was the jury's job to reconcile them. *See Cahill*, 972 N.W.2d at 34. We must view the testimony in the light most favorable to the State. *See Wilson*, 941 N.W.2d at 584.

an hour" rifling through the apartment in her presence. Lamay's testimony was corroborated by video footage depicting Burton's arrival, departure, and subsequent return to the building during the early morning hours of July 17. Although Burton argues the State failed to rule out other possible shooters, our task is to evaluate whether substantial evidence "supports the finding actually made." *LuCore*, 989 N.W.2d at 216. The jury was entitled to credit Lamay's testimony placing Burton in the apartment, gun in hand, in the moments after Chapman was killed.

But the evidence of Burton's involvement does not end there. The Smith & Wesson handgun later confirmed to be the murder weapon was discovered in the white Tahoe along with other items that Burton carried from Chapman's building. At the time of his arrest, Burton held the keys to that vehicle. He also possessed Chapman's phone and wore clothes stained with Chapman's blood. Despite this evidence linking him to the crime scene, Burton told police that he had not been inside Chapman's apartment—an account that the jury was entitled to hold against him. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) (stating "[a] false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt"); *State v. Tucker*, 810 N.W.2d 519, 520–21 (Iowa Ct. App. 2012) (noting a defendant's shifting explanations for the presence of a victim's blood on his clothing contributed to the circumstantial evidence supporting his first-degree murder conviction). Viewing the record in the light most

favorable to the State, we find a rational juror could conclude beyond a reasonable doubt that Burton shot and killed Chapman.[5]

### B. Scienter Elements

Burton also challenges the sufficiency of the evidence on the third and fourth elements of his first-degree murder charge. He argues the State failed to show he "acted with malice aforethought and that he acted willfully, deliberately, premeditatedly, and with the specific intent to kill Sean Chapman." Although Burton's position is somewhat unspecific, he appears to argue that the State presented no direct evidence of his culpable mindset, asking "where are the text messages between Ross and Burton?"

"[I]t is often impossible for a jury to determine a defendant's state of mind without the aid of inference." *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017). Malice aforethought is appropriately inferred from the use of a dangerous weapon. *Id.* at 781; *accord LuCore*, 989 N.W.2d at 217. Here, the jury returned a special interrogatory finding Burton or someone he aided and abetted used a dangerous weapon in committing the offense against Chapman. For the reasons discussed

---

[5] Because there is substantial evidence to support the first element of first-degree murder under an individual liability theory, we need not address Burton's argument that the State failed to prove its alternative aiding-and-abetting theory. *See* Iowa Code § 814.28. Nevertheless, to avoid any doubt, we also find substantial evidence could support an inference that Burton aided and abetted the shooting "either by active participation or by some manner encouraging it prior to or at the time of its commission." *State v. Huser*, 894 N.W.2d 472, 491 (Iowa 2017) (citation omitted). Burton's conduct in the immediate aftermath of the shooting was entirely inconsistent with that of an innocent bystander. *See Fryer v. State*, 325 N.W.2d 400, 406 (Iowa 1982) (explaining the requisite participation for aiding and abetting may be inferred from circumstantial evidence, including a defendant's "conduct . . . after the offense is committed").

above, substantial evidence supports that conclusion and, consequently, the jury's finding of malice aforethought.

"[W]hen accompanied by an opportunity to deliberate," the use of a dangerous weapon "also supports an inference of deliberation and premeditation." *State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001). After fighting with Chapman earlier in the night, Burton threatened to "blow this bitch up" and then left the building for approximately two hours. He returned with a handgun, knocked on Chapman's door, and shot Chapman in the head. These circumstances establish an opportunity to deliberate. *See, e.g.*, *State v. Buenaventura*, 660 N.W.2d 38, 48–49 (Iowa 2003) (noting "premeditation need not exist for any particular length of time" and finding an argument of only two or three minutes provided the defendant "an opportunity to think about what he was doing"); *Tucker*, 810 N.W.2d at 521 (finding a reasonable inference of premeditation where, among other facts, the victim's death was caused by blunt trauma to her head). They are equally probative of Burton's willfulness and specific intent. *See State v. Wilson*, No. 23-1647, 2025 WL 706898, at *4 (Iowa Ct. App. Mar. 5, 2025) (finding substantial evidence a shooting was not accidental where the defendant threatened to shoot the victim and later pointed a gun at the victim's head).

Based on the trial evidence, a rational juror could conclude beyond a reasonable doubt that Burton acted willfully, deliberately, premeditatedly, and with

a specific intent to kill Chapman.[6]  We find sufficient evidence to affirm Burton's conviction for first-degree murder.

## IV.    First-Degree Robbery

Burton also challenges the sufficiency of the evidence to support his conviction for first-degree robbery.  The district court's marshalling instruction identified the following elements for that offense:

1. On or about July 17, 2022, Dontaye Burton, or someone he aided and abetted, had the specific intent to commit a theft.
2. To carry out his intention or to assist him in escaping from the scene, with or without the stolen property, Dontaye Burton, or someone he aided or abetted:
    a. Committed an assault on Sean Chapman, or
    b. Threatened Sean Chapman with, or purposely put him in fear of, immediate serious injury.
3. Dontaye Burton, or someone he aided and abetted, was armed with a dangerous weapon.

Burton argues the State failed to prove that any of these elements were satisfied "before or at the same time the killing occurred."  According to Burton, the trial evidence showed he removed Chapman's belongings "well after the killing [was] done," and so the State proved, at most, an "opportunistic theft" from an individual who was already deceased.

Burton's argument rests on a faulty premise.  Under Iowa law, whether property was actually stolen "is immaterial to the question of guilt or innocence of robbery."  Iowa Code § 711.1(2); *accord State v. Stendrup*, 983 N.W.2d 231, 241 (Iowa 2022).  Thus, the fact that Burton did not remove Chapman's property from

---

[6] Even if that were not the case, Burton's conviction for first-degree murder would stand under the State's alternative felony-murder theory.  *See* Iowa Code § 707.2(1)(b).  As we separately discuss, Burton or someone he aided and abetted was committing the forcible felony of first-degree robbery at the time of Chapman's killing.

the building until after the shooting does not preclude a finding of guilt. All the jury had to decide was (1) whether Burton *intended* to commit a theft, (2) whether he shot Chapman in furtherance of that intent, and (3) whether he was armed with a dangerous weapon. We have already found substantial evidence supports the jury's conclusion with respect to the latter two elements. All that remains is the question of intent.

Intent to commit a theft is rarely capable of direct proof and must often be inferred from surrounding circumstances. *State v. Schminkey*, 597 N.W.2d 785, 789 (Iowa 1999). Lamay testified that, during his first visit to the apartment, Burton demanded money from Chapman. An argument broke out when Chapman refused to pay. After Burton returned and shot Chapman, he promptly began searching the premises. Security cameras then captured Burton, Ross, and Goben removing multiple items of value from the building. From these facts, a reasonable jury could infer that Burton returned to Chapman's apartment not just for violence, but also for profit. Sufficient evidence supports Burton's conviction for first-degree robbery.

**V.     Conclusion**

For the foregoing reasons, we affirm Burton's convictions.

**AFFIRMED.**