# IN THE COURT OF APPEALS OF IOWA

No. 13-1588
Filed November 26, 2014

**DANNY EUGENE JACOBS,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Marion County, Gregory A. Hulse, Judge.

A postconviction-relief applicant appeals from denial of his application and the district court's determination of his restitution obligation. **AFFIRMED.**

Unes J. Booth of Booth Law Firm, Osceola, for appellant.

Thomas J. Miller, Attorney General, Martha E. Trout, Assistant Attorney General, and Ed Bull, County Attorney, for appellee.

Heard by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, J.**

Danny Eugene Jacobs appeals from the denial of his application for postconviction relief (PCR). He asserts ineffective-assistance-of-counsel claims and a due process claim, and he challenges the district court's conclusion that the restitution he must pay for his legal costs does not exceed the statutory guidelines. The State contends as a threshold matter that Danny's[1] failure to timely file a notice of appeal renders this court without jurisdiction.

We find Danny's notice of appeal was timely, thus, this court has jurisdiction to hear the appeal. On the merits, we find Danny fails to establish his trial counsel was ineffective and fails to establish a due process violation. We further conclude the district court correctly ordered Danny to repay his attorney fees based on his ability to pay, not limited by *State v. Dudley*, 766 N.W.2d 606 (Iowa 2009). Accordingly, we affirm.

## I.    JURISDICTION.

Danny's application for postconviction relief proceeded to trial before the PCR court on April 8, 2013. On June 26, 2013, the court entered its findings of fact, conclusions of law, and order. The court denied Danny's ineffective-assistance-of-counsel and due process claims. It found the following with regard to his obligation to reimburse the State for the cost of his legal representation:

> In this case Danny filed a postconviction-relief action and filed a financial affidavit seeking appointment of counsel. The application was granted. Appointment of counsel for indigency is governed by Iowa Code Chapter 815 and the Iowa Administrative Code. A person represented by court-appointed counsel, ". . . has

---

[1] The PCR trial court referenced Jacobs by his first name. We find it expeditious to do the same.

a continuing duty to update information provided in the affidavit of financial status to reflect changes in the information previously provided." Iowa Admin. Code r. 493-10.4(9) (2013). On February 6, 2013, Danny filed an updated financial affidavit which was dated February 4, 2013, showing assets which would indicate Danny is capable of paying his own legal fees. This Court determined at that time, because of the close proximity to the trial, that court-appointed counsel should continue to represent Danny and a determination as to Danny's reasonable ability to pay should be deferred until the time of the trial. The Court entered an order which confirmed that U.J. Booth would continue to represent Danny on a court-appointed basis, that changes in Danny's financial status would be reviewed and taken into consideration by the Court in determining Danny's reasonable ability to repay his court-appointed attorney fees and costs, and that Danny would have the opportunity to present evidence concerning his reasonable ability to pay court-appointed attorney fees and costs at the time of the hearing. Danny did not offer any evidence on his ability to pay at the time of trial. Thus the Court has reviewed the information available to it and concludes that Danny has the reasonable ability to pay attorney fees and expenses in the amount provided by the state public defender. In the event that Danny objects to this determination and wishes to present further evidence with regard to his reasonable ability to pay his court-appointed attorney fees and costs, he should apply to the Court for further hearing within ten days after this ruling is filed with the Clerk of the District Court.

. . . .

[T]he Applicant shall pay restitution for the fees and expenses incurred by his attorney in the total amount approved by the State Public Defender. In the event that the Applicant objects to this determination and wishes to present further evidence with regard to his reasonable ability to pay his court-appointed attorney fees and costs, he should apply to the Court for further hearing within ten days after this ruling is filed with the Clerk of Court.

Eleven days later, on July 5, Danny filed with the clerk of court "APPLICANT'S MOTION TO ENLARGE OR AMEND JUDGMENT (LEGAL ASSISTANCE)." A footnote in Danny's motion asserted:

A motion pursuant to Rule 1.904.(2) (formerly Rule 179(b)) requesting only reconsideration of issues of law and facts pertaining to attorney fees tolls the 30 day period for filing notice of appeal. *Peoples Trust & Sav. Bank v. Baird*, 346 N.W.2d 1, 2 (Iowa 1984); *see also Ginter v. State*, 12-0908, 2013 WL 3274739 (Iowa

App. 2013) (issue regarding assessment of costs not preserved where the postconviction applicant failed to raise the specific issue pursuant to a Rule 1.904 motion or any other means).

In his July 5 motion, Danny cited the court's statement requiring an application for further hearing on the fees ruling. He argued the court ordered him to reimburse the State court-appointed attorney fees in excess of the statutory guidelines. He cited *State v. Dudley*, 766 N.W.2d 606 (Iowa 2009), for the proposition that convicted criminal defendants represented by court-appointed attorneys are subject to the same statutory restitution limitations as those represented by public defenders. *See Dudley*, 766 N.W.2d at 622. He acknowledged there were statutory amendments to the governing code sections after *Dudley*, but asserted because counsel was appointed prior to the amendments, *Dudley* controlled and his obligation to pay restitution was therefore limited to the statutory maximum of $1800.

Danny then asserted, if the court did not agree his obligation was thus limited, that his reasonable ability to pay could not be determined until the total financial obligation was certified by the office of the State Public Defender. He asked the court to

> preserve [his] right to a hearing to determine [his] ability to pay until such time that the State Public Defender has certified the total cost of legal assistance to the Clerk and that [Danny] be given an opportunity to request such hearing after receiving notice of the total cost of legal assistance.

The court set the July 5 "motion" for a hearing, which took place August 15, 2013, at which the court reopened the record on the fee issue. Danny gave new testimony about the fees and his financial resources. Danny's counsel also

represented that the State Public Defender had estimated the total fees and expenses in the case would exceed $80,000. In its ruling, the court granted Danny's motion "to the extent of the clarification" it set forth about Danny's obligations, and reiterated its conclusion that Danny was required to reimburse the State for his legal fees, or the sum of "$30,000, whichever is less." The court issued this ruling on September 11, 2013. Danny filed his notice of appeal on October 4, 2013. Notice of appeal must be filed within thirty days of the final order or judgment. *See* Iowa R. App. P. 6.101(1)(b). Normally, the filing of a rule 1.904(2) motion tolls the period for filing a notice of appeal. *Id.*

The State contends this court does not have jurisdiction because Danny's motion was not a proper rule 1.904(2) motion. The State asserts a rule 1.904(2) motion is for expanding or modifying findings based on evidence already in the record—a party may not retry an issue by presenting new or more evidence as Danny did in litigating the fee issue. Danny responds this was a proper rule 1.904(2) motion that tolled the thirty-day deadline for filing notice of appeal. He cites *Baird*, wherein the supreme court found a motion captioned "motion for rehearing" was actually a rule 179(b) (now 1.904(2)) motion to enlarge and amend, based on its substance. *See Baird*, 346 N.W.2d at 2 (citing to *Kagin's Numismatic Auctions Inc. v. Criswell*, 284 N.W.2d 224, 226 (Iowa 1979)). The "motion for rehearing" asked the court to reconsider issues of law pertaining to the reasonableness of an award of attorney fees. *Id.* The *Baird* court found the motion was properly pled and tolled the period for filing a notice of appeal. Danny also cites *Ginter v. State*, No. 12-0908, 2013 WL 3274739, at *1 (Iowa Ct.

App. June 26, 2013), wherein the PCR applicant failed to raise a rule 1.904(2) challenge when the court assessed her court costs in her unsuccessful action. This court found the issue was not preserved because of her failure to raise it below and the issue was waived. *Id.* at *1. Neither case involved a court hearing new evidence on a 1.904(2) motion as occurred here.

Our reading of the court's June 26 order is that the court offered to keep the record open or reopen the record to give Danny an opportunity to present further evidence on his reasonable ability to pay restitution. The June 26 order was not, therefore, the final judgment on the PCR application. Danny availed himself of the offered opportunity,[2] and the court issued what would be its final judgment on September 11. Although captioned as a rule 1.904(2) motion, the substance of Danny's motion and subsequent hearing was acceptance of the court's offer to present additional record evidence and obtain a ruling based on that record. Thus, the thirty days ran from September 11, and his notice of appeal filed October 4, 2013, was timely. *See* Iowa R. App. P. 6.101(1)(b). Accordingly, we have jurisdiction to hear the appeal.

## II. BACKGROUND FACTS & PROCEEDINGS.

### A. Criminal Trial.

Danny was tried by a jury and convicted of burglary in the first degree, in violation of Iowa Code sections 713.1 and 713.3(1)(c) (1999). At the trial his estranged wife, Stacia, testified that at approximately 9:41 a.m. on December 3,

---

[2] We note that although the court ordered Danny to inform it of his desire to reopen the record within ten days, Danny's filing was on the eleventh day thereafter. Nonetheless, the court set the hearing and proceeded. We deem the issue waived as the State has never raised it.

1999, Danny entered her home and attacked her. She and Danny have three children together who, at that time, were at school. Stacia testified she was doing laundry in the basement of her home in Pella when Danny sneaked in, grabbed her from behind, and placed a rope around her neck, pulling backwards to choke her. Danny told her he was going to kill her. When she struggled against the rope and screamed, Danny placed a hand over her mouth. Stacia bit Danny's hand twice.

Danny stopped choking Stacia with the rope and spoke with her as she sat on the floor of the basement. He inquired what color panties Stacia was wearing. He unzipped her pants and placed his finger over her rectum and vagina. Stacia asked Danny to stop and informed him she was on her period. He then inserted his fingers into her vagina, searching for a tampon string.

At that time, Stacia remembered a friend of hers, Kerry Reed, was supposed to come over around that time. She informed Danny someone else would be coming soon, hoping he would stop. Danny told Stacia he just wanted to talk. She agreed and promised she would not run. Danny allowed her to stand up, tie her shoes, and zip her pants. When Danny turned away, Stacia ran up the stairs and out of the house. She ran to a neighbor's house and called 911. Danny was later arrested in Iowa City.

Stacia later testified Danny was upset because he believed she had been having an intimate relationship with another man, Charles Cowen (Charlie). Danny and Stacia were going through divorce proceedings and fighting over custody of their three children.

The investigation turned up several pieces of physical evidence. The jeans Stacia was wearing had a blood stain near the top button. The blood matched Danny's DNA profile. Stacia was treated by a doctor who testified she had a "through-and-through" laceration on her lip, and abrasions on both sides of her neck. The doctor testified that the neck abrasions were consistent in his experience with rope burns. A police officer testified that he observed Danny had an injury on his hand that looked like a bite mark.

Danny testified to a different version of events. It was his belief that Stacia and her paramour, Charles Cowen, lured him to the house in Pella to frame him for a crime so they could move to Arizona and carry on their relationship. Danny testified that when he and Stacia separated in August of 1999, he left six pairs of dirty work jeans in the family home in Pella. He testified he often came home from work with blood on his jeans. He testified that on December 1 he had a visitation with the children at a park in Pella. While at the park, the children picked up a cat they believed had escaped from their home some months earlier. Danny testified that while he was holding the cat, it scratched his left hand. When he dropped the children off with Stacia again, as he was handing Stacia the cat, his left hand touched her pants. He testified Stacia then said, "Great. You got blood on me. Thanks."

Danny testified that the next day, December 2, as he was working in Iowa City, Stacia called him around 5:00 p.m. and said, "I need to inform you that there has been a bad accident. All three kids have been involved in a bad accident and you better come to Pella quick." He testified it took him about an hour and

forty-five minutes to get to Pella. Once he arrived, Stacia and her paramour, Charlie, attacked him. Charlie kicked Danny repeatedly. He escaped, using Stacia as a shield, as Charlie attempted to punch him. He testified Stacia was wearing the same jeans as she had worn on December 1. Danny got in his car and drove back to where he lived in Iowa City. He did not notify police of the attack.

Danny testified that on December 3, he drove to Des Moines and visited with a friend at his apartment. The friend, Robert Bunner, testified Danny was in his apartment on December 3 from around 9:25 a.m. to 1:00 p.m. Bunner is also Danny's cousin. On cross-examination, the State attempted to impeach Brunner by disclosing that he had lied in depositions about his forgery convictions and had weak recall of the exact time of Danny's visit, admitting that Danny visited often and had done so shortly before the alleged December 3 visit. An administrative assistant at Danny's employer in Des Moines testified Danny picked up his paycheck that day. A login record shows Danny was on the premises from 1:34 to 1:40 p.m.[3]

Danny was arrested in Iowa City and charged with burglary in the first degree, attempt to commit murder, sexual abuse in the third degree, stalking, kidnapping in the first degree via serious injury, kidnapping in the first degree via torture, kidnapping in the first degree via sexual abuse, and kidnapping in the first degree via interference with government function. By the time the case came on

---

[3] Danny called other alibi witnesses, and the State impeached each of them on various grounds.

for trial, the State had dismissed all but the burglary charge.[4]  The jury found

Danny guilty, and the court sentenced him to an indeterminate term of twenty-five

years.  This court affirmed the conviction on direct appeal.  *State v. Jacobs*, No.

01-0826, 2002 WL 1428785 (Iowa Ct. App. July 3, 2002).  We preserved Danny's

ineffective-assistance-of-counsel claims for postconviction-relief proceedings.

### B.      Postconviction-Relief Proceedings.

#### 1.      John Cayton.

Danny filed his application for postconviction relief asserting numerous

ineffective-assistance and due process claims.  At the PCR trial, Danny called

John Cayton, a forensic firearm and tool mark examiner.  Cayton had worked in a

police department for about thirty years in Missouri.  Cayton testified that he

reviewed the trial transcripts, evidence reports, and photographs, and examined

the physical evidence prior to testifying.

He opined that if Stacia's testimony was true, there should have been

blood on Stacia's shoes and shoestrings and there was none.  He also tested

Stacia's jeans and determined there was sperm on the fabric.  Genetic testing

---

[4] Danny was convicted of burglary in the first degree, in violation of Iowa Code sections 713.1 and 713.3(1)(c).  Section 713.1 provides:

> Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license or privilege to do so, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person's right, license or privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.

Section 713.3(1)(c) provides:

> 1. A person commits burglary in the first degree if, while perpetrating a burglary in or upon an occupied structure in which one or more persons are present, any of the following circumstances apply:
>
> . . . .
>
> > c. The person intentionally or recklessly inflicts bodily injury on any person.

disclosed this came from someone other than Danny. Cayton pointed out that Stacia's panties at the time of the attack were not collected, nor was the tampon Stacia testified she was using. He examined the photos of Stacia's injuries and attested he did some tests, using his wife as a model, of the effect of a half-inch nylon rope on her neck, by rubbing the rope "against her neck pretty hard" for five minutes and looking at the resulting marks. He also attempted the test placing a necklace around the neck at the same time. He concluded the placement and severity of the marks on Stacia's neck were not consistent with her testimony that she was choked from behind. He did not observe human bite marks on Danny's hand, but opined they were scratch marks consistent with being scratched by a cat claw.

The PCR court made the following findings regarding Cayton's testimony:

Mr. Cayton's expertise with regard to the alleged bite marks and bloodstain analysis is marginal. He has no medical training except observing autopsies and listening to lectures. According to him, his expertise in bite marks comes from working with teams of people doing investigations. Assuming that his opinions on those subjects would even be admissible, the weight to give to his opinions would be questionable. That weight could certainly be influenced by his past employment record, which raises substantial questions concerning his competency. His answers to questions regarding termination of his employment in the past by two different agencies were evasive and not credible. Overall he offered no expertise other than opinions based on his review of the evidence and the results of tests that he conducted. In particular, his testimony that a one-half inch nylon rope rubbed on a person's neck for five minutes would not leave marks is not credible. Otherwise, he did no more than try to connect the dots between evidentiary items, which was the same evidence considered by the jury.

### 2. *Clayton Jacobs.*

Danny next called Clayton, his son with Stacia. Clayton had been twelve years old at the time of the incident and was twenty-five at the PCR trial. Clayton is legally blind: he is able to observe light, shadows, and colors but does not have detailed vision. Clayton testified that on December 1, 1999, two days before the attack, he and his two siblings had a scheduled visitation with Danny at a park in Pella. Clayton testified they found a cat they initially believed had gone missing from their home the previous July. However, upon further examination, they determined it was not their missing cat. Clayton testified that during the visitation, Danny stated the cat scratched him and that he was bleeding. Clayton stated he knew it was Danny's right hand that was scratched because his sibling asked Danny to move his right hand off the cat so she could pet it. He also stated he knew the cat had scratched Danny with its back paws, because Danny told him the cat did not have front claws. Clayton admitted he was not able to see the blood. When the visitation was over, Danny brought the cat to Stacia. Clayton testified that, as Danny handed her the cat, Stacia stated, "God damn it, you're dripping blood all over my pants." On the day of the attack, Stacia picked Clayton up after school with two of her friends and stated, "gleeful[ly]" that "she was glad that she hadn't washed her clothes for three days because of the fact that the clothes contained [Danny's] blood from when he was scratched by the cat and the DNA from when [Danny] was scratched by the cat."

Clayton also testified about a meeting he asserted he had with the prosecutor, Jane Orlanes. He testified Orlanes approached him at his high

school in Tiffin, Iowa, told him she was a member of the Iowa House of Representatives, and asked him for his help in winning her case against Danny. She told him she needed to win the case so that she would receive an increase in federal funding to support victims of domestic abuse. He described Orlane's vehicle as a dark-colored four-door car. He testified Orlanes asked him whether Danny had been scratched by a cat on December 1, and Clayton told her yes. That was the only question Orlanes asked him. Orlanes then drove Clayton to meet Stacia and told Stacia she would not make any report or notes about the conversation she had just had with Clayton because if she did she would be required to turn the information over to Danny and defense counsel.

The PCR court made the following findings regarding Clayton's testimony:

Clayton was reminded by applicant's counsel that there were inconsistencies between a statement that he gave in 2009 and what he had testified to at the PCR trial. For example, he stated earlier that it was Stacia that had been scratched by the cat and not his dad. His explanation for the inconsistencies was that when he was being asked questions earlier, he had no time to think about his answers. He testified that since that time he has had time to reconstruct in his mind what actually happened. He further testified that he has a volatile relationship with his mother and that he is upset with her because she subjected him and his siblings to abuse. After reviewing the inconsistent statements of Clayton and Jane[ ] Orlanes concerning this alleged meeting prior to trial, the Court finds Clayton's testimony is not credible.

Further, with regard to the meeting with Orlanes, the court found:

Clayton's testimony at this stage [during the PCR trial] is not believable as he testified his memory is better after he has pieced together what had happened. The Court cannot be sure his testimony is based on his own recollection or influence of others.
. . . .
The Court concludes that Clayton Jacobs' testimony in regard to being interviewed by Jane Orlanes prior to trial is not credible.

### 3. Trial counsel Roger Hudson.

The State called Danny's trial counsel, Roger Hudson, to testify. Hudson's defense strategies were asserting an alibi and attacking issues with the chain of custody. Hudson's primary theory was that Stacia had fabricated the entire attack. He had two theories for how Danny's blood got on Stacia's jeans. First, that Danny had left a dirty pair of his own jeans in Stacia's home and Stacia wore them to frame Danny for the crime. He had Danny try the jeans on at the police department to see if they fit; he recalled the jeans were fairly tight. The second theory arose later in the defense and was that the cat in the park had scratched Danny and the blood got on Stacia's jeans when Danny was handing her the cat. However, Hudson thought the cat theory did not "mesh" well with the main defense that Stacia had fabricated the story and considered it only a "backup" theory.

He also pursued a strategy of attacking the chain of custody on several items of physical evidence because he was concerned at the time that the division of criminal investigation (DCI) had mishandled the evidence and that there may have been cross-contamination. Hudson consulted with and deposed a forensics specialist, Dick Warrington, but did not call Warrington to testify at trial. Warrington indicated in a letter to Hudson that he recommended he not testify because he did not discover any serious irregularities with the investigation and, on cross-examination, he would have to concede that the DCI did a good job on some investigation procedures. Instead, Hudson attempted to

impeach the chain of custody in his cross-examination of every State witness who handled the physical evidence.

Hudson also testified he did not interview the three children in the family because Danny did not want him to involve them. Each child had a number of special health needs. Hudson also was concerned, because there was an ongoing custody case between Stacia and Danny and the children had been in Stacia's custody for some time, that the children would say something unhelpful to Danny.

Hudson recalled investigating theories Danny had that Stacia and Charlie had planned to frame him. He described Danny's theories as "myriad." He recalled speaking to an expert about assessing the marks on Stacia's neck and whether they could have been caused by a necklace instead of a rope. He admitted that he did not ask many questions directly attacking Stacia's testimony, but explained he had experience deposing her, he had a good idea what her testimony would be, and his questioning at the time would have used that knowledge. Hudson also testified that the theory that Charlie and Stacia lured Danny to Stacia's home to assault him was brought up to him late in the trial preparation process.

### 4. Prosecutor Jane Orlanes.

Jane Orlanes also testified at the PCR trial. Orlanes testified that she only spoke with Danny's children "in passing" because Stacia would bring them to the office when she met with the prosecutors. She denied questioning Clayton about the allegations, meeting with him at his school, representing to him that she was

a member of the House of Representatives, asking him if a cat had scratched Danny, or stating that she would not give information regarding the interview to Danny and his attorney. Orlanes was an assistant Marion County prosecutor. She denied ever travelling to Johnson County to meet with Stacia. She testified she had no assistant in the county attorney's office helping her on this case; however, there was an area prosecutor from the office of the attorney general assisting. Orlanes acknowledged she drove a navy blue or black four-door vehicle. The court found Orlanes credible.

The district court denied Danny's application for postconviction relief. On appeal, Danny contends Hudson was ineffective in (1) pursuing an unreasonable defense strategy, (2) failing to call expert witnesses, (3) failing to interview the children, (4) failing to present evidence that Stacia had motive to fabricate the attack, (5) failing to present evidence that corroborated Danny's testimony, and (6) failing to discover and present evidence of collusion between Charlie, Stacia, and her parents. He further contends the State violated his right to due process by withholding exculpatory information about the interview with Clayton in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). He also appeals the court's determination of his restitution obligation.

## III. STANDARD OF REVIEW.

We generally review an appeal from a denial of a postconviction-relief application for correction of errors at law. *Lado v. State*, 804 N.W.2d 248, 250 (Iowa 2011). When the applicant's claims are constitutional in nature, we engage in de novo review. *Id.* We give weight to the PCR court's findings concerning

witness credibility. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). The claims must be evaluated in the totality of the circumstances. *Everett v. State*, 789 N.W.2d 151, 155 (Iowa 2010).

## IV. ANALYSIS.

### A. Ineffective-Assistance-of-Counsel Claims.

We analyze ineffective-assistance-of-counsel claims under the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *State v. Ross*, 845 N.W.2d 692, 697-98 (Iowa 2014). We may affirm the PCR court's rejection of the claim if either element is lacking. *Lamasters v. State*, 821 N.W.2d 856, 866 (Iowa 2012). The first prong requires the applicant to show a deficiency in counsel's performance. *Strickland*, 466 U.S. at 687. There is a presumption that the attorney performed competently. *Ross*, 845 N.W.2d at 698. The applicant bears the burden to show by a preponderance of the evidence that counsel failed to perform an essential duty. *Id.* Trial counsel has no duty to raise an issue that lacks merit. *Id.*

The second prong requires a showing that the deficient performance of counsel deprived the applicant of a fair trial. *Ross*, 845 N.W.2d at 698. The applicant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Ledzema*, 626 N.W.2d at 143.

"Improvident trial strategy, miscalculated tactics or mistakes in judgment do not necessarily amount to ineffective counsel." *Lamasters*, 821 N.W.2d at 866 (quoting *Hinkle v. State*, 290 N.W.2d 28, 34 (Iowa 1980)). The applicant

must show more than that trial strategy backfired or another attorney would have prepared and tried the case differently. *Ross*, 845 N.W.2d at 698. "[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed under the Sixth Amendment." *Ledzema*, 626 N.W.2d at 143. "When counsel makes a reasonable tactical decision, this court will not engage in second-guessing." *Lamasters*, 821 N.W.2d at 866 (quoting *Fryer v. State*, 325 N.W.2d 400, 413 (Iowa 1982)). "Selection of the primary theory or theories of defense is a tactical matter." *Id.* (quoting *Schrier v. State*, 347 N.W.2d 657, 663 (Iowa 1984)). It is not enough to claim that counsel should have done a better job. *Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994). The applicant must state the specific ways in which counsel's performance was inadequate and identify how competent representation would have changed the outcome. *Id.*

### 1.  Counsel's strategy was not reasonable.

Danny contends Hudson was ineffective in pursuing a defense strategy that was not reasonable. Specifically, he asserts the following: First, he contends the chain of custody strategy was tantamount to no defense at all because although Warrington was deposed, counsel did not call him as a witness to discredit the chain of custody. Second, he contends counsel did not pursue a strategy of discrediting Stacia's version of events to aid his alibi defense. Third, he contends counsel's theory that the blood-stained jeans were left behind at Stacia's house by Danny, the "dirty jeans theory," was not credible or plausible,

and counsel should have pursued the "cat scratch theory" to explain how Danny's blood got on Stacia's jeans.

Counsel explained that he did not call Warrington to testify about the chain of custody because he was concerned Warrington's testimony could actually acknowledge and emphasize that the police officers carried out the investigation competently. Therefore, he attempted to pursue the strategy of attacking the chain of custody by impeaching the investigators who testified individually. Under the circumstances, it appears the strategy did not work, but it was a reasonable tactical decision, particularly because Warrington himself recommended against having him testify. Danny does not explain what evidence of Stacia's fabrication of the incident was available to enhance his alibi. The district court found Cayton's testimony contradicting the State's construction of the evidence at trial was not credible because of his lack of expertise and his own evasiveness as to his credentials. On our examination of the PCR trial records, we agree with the PCR court's conclusions as to Cayton. Hudson also explained that he considered the "dirty jeans theory" the primary explanation for the blood on the jeans because it was more consistent with the overall theory that Stacia fabricated the attack. If Danny had left a pair of his own jeans at Stacia's home, that she knew had a drop of his blood on them, she could fabricate the story and explain that Danny got blood on the jeans when he attacked her, even if Danny had no physical contact with the jeans on December 1st or 3rd. It was a reasonable tactical decision to prioritize the first theory as more plausible than the second. Under the circumstances of the case and in the

face of Stacia's own, apparently credible, testimony about the events of that morning, Hudson's strategy going into trial was a reasonable one and we do not find he was constitutionally inadequate in pursuing it, even if it was not ultimately successful.

### 2.    Counsel failed to call expert witnesses.

The PCR court concluded Hudson had failed in an essential duty by failing to call an expert to refute the State's evidence about the injuries to Stacia and on Danny's hand.  Danny contends if Hudson had put on evidence that Stacia's injuries could not have been inflicted the way she claimed or that the injury on Danny's hand was not a bite mark, it would have discredited Stacia's testimony enough to result in a different outcome.  He argues it was not sufficient for the jurors to be able to examine photographs of the injuries and draw conclusions themselves.  Hudson explained he did not attempt to impeach Stacia in cross-examination because he had deposed her and thought she would lie, but he also did not seek out an expert to discuss the source of Stacia's injuries or provide evidence contradicting Stacia's testimony.  Reasonable counsel would have pursued such evidence because the primary defense theory was Danny was not there on December 3 assaulting Stacia as she described.  Reasonable counsel would have at least attempted to account for the source of Stacia's documented injuries given that the defense theory implied they were either self-inflicted or the result of the alleged December 2 assault on Danny.  Accordingly, we agree with the district court that Hudson failed in an essential duty to contradict the State's evidence.

However, the district court found Danny failed to show he was prejudiced by this error. Danny contends there is a reasonable probability that if such opinions had been presented to the jury, "at least one juror would have voted to acquit." However, the testimony Danny adduced at the PCR trial was not persuasive that such evidence would have been discovered had Hudson sought it out because Danny's witness lacked credibility in making those determinations. This would have impacted the weight the jury would apply to his testimony. In addition, the jury heard Danny testify in support of his theory, however, it also heard Stacia testify and it apparently simply did not believe Danny's version of the events. Although he did not recall doing so, various papers from Hudson's trial preparation disclosed he contacted a forensic dentist. He consulted Warrington but made a specific strategic decision not to call him. Hudson's failure to call an expert at trial does not undermine confidence in the outcome of the trial. Thus, Danny cannot show he was prejudiced.

### 3. Counsel failed to interview the children.

Danny now contends Hudson erred in not interviewing his children, because if Hudson had interviewed Clayton, he could have had Clayton corroborate much of Danny's own testimony about the cat scratch, recount Stacia's statements that she was glad she had not washed Danny's old jeans, and describe Orlane's attempt to conceal evidence from the defense. Hudson explained that Danny himself did not want the children involved in the criminal case. The children had various special needs. Hudson too was concerned that they had been in Stacia's custody at the time of the incident and for long enough

that they might say something that would be damaging to Danny's defense. We find nothing unreasonable in counsel's conduct. He did not fail in an essential duty.

### 4. Counsel failed to present evidence of Stacia's motivation to fabricate.

Danny contends Hudson was ineffective in failing to present evidence of Stacia's motivation to fabricate the attack. He argues counsel did not ask any questions on his cross-examination of Stacia to demonstrate her motivations to fabricate. Counsel had, prior to trial, filed a motion in limine to exclude references to past allegations Stacia had made against Danny, including assaults and violation of a no-contact order. However, none of the former accusations resulted in convictions. Despite the motion in limine, Hudson questioned Danny on these prior incidents. The PCR court acknowledged it was surprised that Hudson would introduce those allegations. Hudson explained he did not attempt to impeach Stacia or demonstrate her motives on cross-examination because he had experience cross-examining her from the deposition and knew what her answers would be. Instead, counsel presented evidence of unsubstantiated accusations made in the past by Stacia through Danny's testimony to demonstrate a motivation to lie. At the PCR trial, he told the court he wanted to question Danny on these incidents because he believed if he had questioned Stacia, she would have lied. This is a tactical decision that was not unreasonable under the circumstances and in light of counsel's experience with the witness. Danny also argues Hudson failed to offer evidence of Stacia's

pattern of conduct demonstrating a motive to fabricate. This evidence included Stacia's prior unsubstantiated accusations, which counsel did question Danny on.

Danny also adduced a letter from Stacia to her paramour, Charlie, stating, "I believe that we are right for each other and hope we can get rid of Dan Or hire someone!!!! God babe, I am so scared." Even if counsel's failure to introduce this letter was a failure in an essential duty, Danny fails to assert any way in which the failure to present the letter undermines confidence in the outcome of the trial.

### 5. Counsel failed to present evidence to corroborate Danny's story.

Danny asserts again that counsel should have interviewed the children to present corroborating evidence for the "cat-scratch theory." We have already determined counsel did not fail to perform an essential duty in not interviewing the children.

Danny also asserts counsel should have called Kerry Reed, Stacia's friend who was supposed to visit her the morning of the attack. In an interview in 2008, Reed told a private investigator that Stacia told her the cat was vicious and had scratched someone. At the PCR trial, Reed could not recall making this statement or the conversation it came from, but the court admitted the transcript of the interview without objection. Danny argues Reed's statement would have corroborated his own testimony that the cat scratched him and there is a "reasonable probability that at least one juror would have voted to acquit if" Kerry

and Clayton had been called. Evidence supporting the proposition that the cat had a tendency to scratch people does not, in our view, undermine confidence in the outcome of the case. It would have provided only minor corroboration to a minor element of Danny's testimony. Given that the victim provided eye witness testimony as to what occurred, we cannot fault Hudson for not calling Reed to provide this corroboration. It certainly was not a failure in an essential duty.

Danny also asserts counsel failed in an essential duty by failing to present evidence to corroborate Danny's testimony that Charlie and Stacia assaulted him on December 2. He asserts counsel could have done a number of things to turn up additional evidence in the case that would have supported his testimony in various indirect ways. Danny neglected entirely to argue how the failure to uncover and present any of this evidence undermines confidence in the outcome of the case. Danny failed to demonstrate he was prejudiced by counsel's conduct.

### 6. Counsel failed to discover and present evidence of collusion between Charlie, Stacia, and her parents.

Danny contends counsel was ineffective for failing to discover and present numerous pieces of information about communications between Charlie, Stacia, and her parents that he contends supports his testimony that Charlie and Stacia lured him to Pella to assault him so they could carry on their relationship.[5] He

---

[5] Danny asserts:

> Counsel failed to consider, discover and present evidence of collusion: (1) that Stacia, Charlie and her parents were working together to "get rid" of Dan; (2) that they conspired to have Charlie take Stacia and the children to Arizona on July 4th; (3) that they conspired to have Charlie move to

does not argue how he was prejudiced by the failure to discover these items. His tying together of the various items of information (some which are demonstrable facts, and some of which are merely speculative assertions) is not the primary defense theory counsel pursued at trial. Counsel in fact described Danny's various theories about what happened as "conspiracies" and recalled that Danny's theories were numerous. Counsel testified he spent a lot of time investigating many similar ideas and that there was extensive discovery but he did not recall the possibility of Charlie's collusion in an attack to be an issue at the time. From his testimony it appears Hudson spent some time investigating various avenues and determined a strategy that involved weaving together the aspects of an alleged conspiracy was not appropriate. We cannot conclude counsel's decision was unreasonable, and Danny neglects to argue how he was prejudiced.

---

Iowa on Thanksgiving to provide twenty-four-hour protection for Stacia; (4) that Charlie "protected" Stacia by following Dan; (5) that the opportunity to frame Dan arose when Dan was scratched by a cat and got his blood on her jeans on December 1; (6) that Stacia called her parents' home and spoke for forty minutes immediately following the cat incident; (7) that there was a four-minute call from Charlie to Stacia on December 2 at the time Dan said he was lured to Stacia's house and attacked; (8) that Stacia knew Dan was not scheduled to work on December 3; (9) that Stacia called her parents' home at 3:56 a.m. on December 3; (10) that Stacia attempted to hide the true nature of her relationship with Charlie by erasing her computer, flushing her tampon, hiding her underwear and telling the doctor she had not been penetrated to avoid a rape exam and collection of specimens; (11) that Stacia's car was not in the driveway the morning of December 3; (12) that Charlie had driven Stacia's car to her parents' home; and, (13) that Stacia's father was following Dan on December 3 and reported his location to the Iowa City police for the arrest.

### 7.    *Cumulative prejudice.*

Because there are multiple ineffective-assistance-of-counsel claims, we look to the cumulative effect of counsel's errors to determine whether the applicant satisfied the prejudice prong of the test. *See State v. Clay*, 824 N.W.2d 488, 501-03 (Iowa 2012). Taken together within the totality of the circumstances and in light of the strength of the testimony of the victim, Stacia, we conclude counsel's actions did not cause prejudice to Danny.

### B.    Due Process Claims.

Danny contends the prosecutor violated his right to due process by withholding exculpatory evidence that Clayton knew the cat scratched Danny's hand. The State violates a criminal defendant's rights under the Due Process Clause of the Fourteenth Amendment when it fails to disclose evidence that may be favorable to the defendant. *Harrington v. State*, 659 N.W.2d 509, 516 (Iowa 2003) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). To establish a violation, the defendant has the burden to prove (1) the prosecution suppressed the evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material to the issue of guilt. *Harrington*, 659 N.W.2d at 516. As a preliminary matter, Danny cannot establish that the conversation took place. The PCR court found Clayton was not credible and Orlanes was credible. We see no need to depart from the PCR court's credibility determinations.[6] On our

---

[6] Danny asserts, "A lower court's credibility findings are binding only if the reviewing court finds, after independent consideration of extrinsic contradictory evidence and internal inconsistencies, that there is substantial evidence to establish that no reasonable juror would have found the evidence or testimony to be credible." Danny cites *State v. Taylor*, 830 N.W.2d 288, 296-97 (Iowa 2013), however, where the

examination of the PCR transcript, we too conclude Clayton was not credible both because of his age at the time of the incident and the length of the intervening years. Danny has not established a due process violation.

### C. Restitution Limitation.

The court ordered Danny to pay restitution to the state for his legal fees in the amount certified by the State Public Defender or the sum of $30,000, whichever is less. Danny contends this was in excess of the statutory fee guideline. He does not contest the court's determination of his ability to pay. We review claims requiring statutory construction for correction of errors at law. *Dudley*, 766 N.W.2d at 612.

The Office of the State Public Defender establishes fee limitations for various types of cases. *See* Iowa Code § 12B.4(4)(a). Persons who are granted court-appointed attorneys are required to reimburse the state for the cost of legal assistance. *See* Iowa Code § 815.9(3). In 2004, when the court appointed Danny's PCR counsel, the fee limitation for a "B" felony would have been $1800. In 2009, in *State v. Dudley*, our supreme court determined that defendants represented by court-appointed attorneys should have the same fee reimbursement limitations as those represented by public defenders. 766 N.W.2d at 622. In response, our legislature amended section 815.4 in 2012 to

---

appellate court chose to depart from the district court's credibility findings. The court explained that when it makes its *own* credibility determinations, it considers the extrinsic evidence for contradictions and internal inconsistencies. *Id.* It does not base its deference to the PCR court's determination on a lack of contradictory evidence or internal inconsistencies. Deference to the trial court's credibility determinations is based instead on the court having a "firsthand opportunity to hear the evidence and view the witnesses." *In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007).

provide, "The expense of the public defender may exceed the fee limitations established in section 13B.4." Danny argues *Dudley* should be applied retroactively to his case so that he receives the benefit of the limitation. However, he does not explain why in his case *Dudley* should be applied retroactively, but the statute should not.

Generally, a statute is presumed to be prospective in its operation unless expressly made retrospective. *Schuler v. Rodberg*, 516 N.W.2d 902, 904 (Iowa 1994). However, statutes that are remedial or procedural in nature are exceptions to the general rule and may be applied retroactively. *Id.* This is because retrospectivity is relevant only when statutes create or take away vested rights. *See id.* Here, the amendment provides the amount of restitution an indigent person may be required to pay can exceed the fee limitations set out in section 13B.4. The substantive right guaranteed by the constitution to indigent defendants is the right to the appointment of counsel. There is no vested right to have counsel at nominal cost. Therefore, the statute in question here is procedural only and consequently retroactive in application. The applicable law at the time the court assessed Danny's fees was the 2012 amendment to section 815.4, which provided no limitation to the fees. Therefore, the court did not err in ordering Danny to pay the lesser of the full costs or $30,000.

## V.    CONCLUSION.

We conclude the PCR court did not issue its final ruling in the case until September 11, 2013, so Danny's October 4, 2013 notice of appeal was timely, and this court has jurisdiction. We further find Danny failed to show his trial

counsel was ineffective and failed to establish a due process violation contrary to the requirements of *Brady v. Maryland*.   With respect to the reimbursement requirement, we find the district court correctly found the existing statute, at the time of the assessment, applied to require Danny to reimburse the state for his attorney fees beyond the statutory limitations provided in *State v. Dudley.* Accordingly, we affirm the PCR court ruling.

**AFFIRMED.**